UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

GAYLA A. MOATES,                          )
                                          )
*Plaintiff,*                              )
                                          )        Case No. 1:11-CV-00293
v.                                        )
                                          )        Judge Mattice
HAMILTON COUNTY, TENNESSEE                )
HAMILTON COUNTY REGISTER                  )
OF DEEDS OFFICE, and                      )
PAM HURST, REGISTER OF DEEDS,             )
                                          )
*Defendants.*                             )
                                          )

## MEMORANDUM AND ORDER

Before the Court is a Motion for Summary Judgment filed jointly by Defendants Hamilton County, Tennessee, the Hamilton County Register of Deeds Office (hereinafter "Deeds office"), and Pam Hurst. (Doc. 25). The Court has considered Defendants' Motion (Doc. 25), Plaintiff's Response (Doc. 30), and Defendants' Reply (Doc. 32), as well as the accompanying evidence. For the reasons stated herein, Defendants' Motion for Summary Judgment will be **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND

For the purpose of summary judgment, the Court will view the facts in the light most favorable to Plaintiff. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In August 1997, Plaintiff began working as a Deputy Clerk in the Deeds office. (Doc. 25-1 at 4). During her employment, Plaintiff worked 10-hour shifts 4 days a week. (*Id.* at 8). Her immediate supervisor was the Chief Deputy Clerk, Carrie Millard, who reported to Pam Hurst, the Register of Deeds. (*Id.* at 5-6). As a Deputy Clerk, Plaintiff's

main duties were typing, reading and delivering documents, loading microfilm, and maneuvering the microfilm machine to do a back-scanning project. (Doc. 30-3 at 39-40). Plaintiff described her duties in working at this position as follows:

> The documents came in through the front line and then when they were sent to us or when we picked them up, you went over the document and you made sure the title on it was correct that was in the computer. And if the typed name or the name of the financial organization didn't match somewhere on that first page or had an also known as with the name, you would be sure it was entered as well in the screen.
>
> And if the person signed their name differently from the way it was printed in the document, you made sure that was there as well. But you just double checked to be sure and make sure the pages were counted and in order and that the last page was really the last page and they hadn't been transposed.

(*Id.* at 5: 1-16).

Throughout the last five years of her employment, Plaintiff was treated for rheumatoid arthritis. (Doc. 30-2 at 7-8). Rheumatoid arthritis was described by Plaintiff's rheumatologist, Dr. Richard Brackett, as a systemic disease that causes "your joints [to get] eaten up by your immune system." (*Id.* at 9). Typical symptoms of rheumatoid arthritis include pain, swelling, and stiffness of the joints. (*Id.* at 9-10). Dr. Brackett testified that Plaintiff specifically had difficulty walking, lifting things, sleeping, and suffered from weakness due to pain in her joints. (*Id.* at 12). Plaintiff testified that she has pain in her feet, elbows, legs, and shoulders and that her knees "feel kind of watery like Jello sometimes," which affects her ability to stand. (Doc. 30-1 at 7-8).

During Plaintiff's employment, Hurst suggested that Plaintiff may be able to get disability benefits. (*Id.* at 24). On one occasion, Hurst also required Plaintiff to move her car to her assigned parking spot rather than parking in the public handicapped spot.

(*Id.* at 26-27). Plaintiff interpreted this comment as discriminating against her alleged "disability." (*Id.*).

In 2009, all employees at the Deeds office were assigned to work on an extra project involving scanning older records. (Doc. 30-3 at 28, 30). Hurst permitted Plaintiff to scan fewer records than other employees, although she informed Plaintiff that it was very important that she complete the back-scan project because incomplete performance may reflect negatively on her employment. (*Id.* at 27). On April 15, 2009, Hurst performed an evaluation of Plaintiff, wherein she indicated that Plaintiff was not performing satisfactorily because of: excessive sick leave; lateness to work; unbelievable excuses for absences; unscheduled short-term absences; "goofing off;" excessive personal telephone calls; refusal to follow procedures; and disregarding work orders. (Doc. 30-5 at 3). In January 2010, Hurst informed Plaintiff that she would need to complete scanning of two books a day to be fit for work and that if she was not able to do this, she would be reduced to part-time employment. (Doc. 30-4 at 2).

Plaintiff met with Dr. Brackett in June 2010, and he referred her for an MRI. (Doc. 25-3 at 4-5). The MRI showed that she had a torn right rotator cuff and needed to have corrective surgery. (*Id.*). Dr. Brackett testified that it is possible that Plaintiff's rheumatoid arthritis caused her rotator cuff tear. (*Id.* at 5). When asked if a patient with rheumatoid arthritis is more prone to injure her shoulder, he stated that "[that patient's] tissues themselves tend to be weaker and [if] subjected to minor injuries can cause major problems." (Doc. 30-2 at 15-16). Plaintiff's orthopedic surgeon, Dr. Mark Sumida, performed her rotator cuff surgery on August 20, 2010. (Doc. 30-11 at 2). After consulting with Dr. Sumida in October 2010, Plaintiff planned to return to work after

her Family and Medical Leave Act ("FMLA") time expired in November.[1]  (*Id.*). Plaintiff's FMLA leave officially expired on November 3, 2010, but the Deeds office permitted her to continue unpaid leave through November 11, 2010.  (Doc. 30-13 at 2).

While Plaintiff was out on leave, Dr. Sumida was given a job description detailing Plaintiff's position so that he could accurately determine when she would be able to return to work.  (Doc. 30-3 at 22).  On November 11, 2010, Dr. Sumida cleared Plaintiff to return to work on November 15, 2010.  (Doc. 30-9 at 9-11).  Plaintiff was placed on certain medical restrictions, including only typing for an hour at a time, with a ten to fifteen minute break between typing sessions, no overhead filing, and no lifting over five pounds at a time.[2]  (*Id.* at 8).  Plaintiff was also required to attend physical therapy, which could be scheduled on her day off.  (Doc. 30-15 at 2).

Hurst reviewed the restrictions and, after talking with Plaintiff's physical therapist and legal counsel, determined that the Deeds office could not permit Plaintiff to take a fifteen minute break every hour.[3]  (Doc. 25-2 at 21-22).  On November 16, 2010, Hurst terminated Plaintiff, stating that her breaks would cause too much "disruption" in the office.  (Doc. 30-18 at 2).  When Hurst was later asked whether the Deeds Office could reasonably accommodate Plaintiff, she discussed the possibility that Plaintiff could have worked in the front part of the office, which would have involved

---

[1] Plaintiff only had eleven weeks of FMLA leave remaining for this procedure because of a leave of absence that she took pursuant to the FMLA in February 2010.  (Doc. 30-12 at 2).  Plaintiff vigorously disputes whether she was told that she had eleven or twelve weeks of FMLA leave remaining.  (Doc. 30 at 8).  This dispute is not material, however, because Plaintiff was ultimately given twelve weeks of FMLA leave.  (Doc. 30-12 at 2).

[2] The parties also vigorously dispute whether this ten to fifteen minute break was a break from all work or a break from typing.  (Doc. 25 at 6; Doc. 30 at 10).

[3] Defendants argue in their brief that Hurst "contacted" Dr. Sumida's office to discuss Plaintiff's restrictions.  (Doc. 25 at 11).  Dr. Sumida, however, testified that he ultimately never had a discussion with Defendants regarding Plaintiff's medical restrictions.  (Doc. 30-9 at 11).

4

Plaintiff working with customers and running the copying machine. (Doc. 30-3 at 71). Hurst testified that she did not consider the possibility of offering Plaintiff part-time work during her recovery or permitting her to do other tasks during the ten to fifteen minute breaks. (*Id.* at 72). At Plaintiff's unemployment hearing on February 8, 2011, Hurst explained that, in determining whether to terminate Plaintiff, Defendants considered the amount of leave she had left as well as her productivity. (Doc. 30-19 at 3). Plaintiff's medical restrictions were lifted on April 25, 2011. (Doc. 25-1 at 33). Following Plaintiff's termination, other employees were able to assume her work, and no new employees were hired to fill her position. (Doc. 30-3 at 67).

Plaintiff initiated this action on October 14, 2011. (Doc. 1). In her First Amended Complaint, Plaintiff claims that Defendants subjected her to various unlawful employment practices.[4] (Doc. 15 at 1-7). Specifically, Plaintiff claims that Defendants should be liable for both interference and retaliation under the FMLA, age discrimination under the Tennessee Disability Act ("TDA") and the Americans with Disabilities Act ("ADA"), and discrimination in violation of 42 U.S.C. § 1983. (*Id.* at 4-6). Defendants now seek summary judgment. (*See* Docs. 24, 25).

## II.   SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 instructs the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting the presence or absence of genuine issues of material facts must support its position either by "citing to particular parts of materials in the record," including

---

[4] In addition to the claims addressed in Defendants' Motion for Summary Judgment, Plaintiff also raised claims for age discrimination in her First Amended Complaint in violation of the Age Discrimination in Employment Act and the Tennessee Human Rights Act. (Doc. 15). The parties jointly stipulated to dismissal of these claims on November 27, 2012. (Doc. 23).

depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). As previously noted, when ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita*, 475 U.S. at 586; Fed. R. Civ. P. 56). The nonmoving party must present sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial. *Anderson*, 477 U.S. at 248-49 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)); *see also White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475-76 (6th Cir. 2010). A mere scintilla of evidence is not enough; there must be evidence from which a

6

jury could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252; *Moldowan*, 578 F.3d at 374. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

## III. ANALYSIS

### A. ADA and TDA Claims

Plaintiff advances three arguments in support of her claim under the ADA: (1) Plaintiff's rheumatoid arthritis is a qualifying disability and her torn rotator cuff was a related impairment; (2) Defendants failed to grant her a reasonable accommodation; and (3) Defendants directly and indirectly discriminated against her through "routine negative comments" and discipline related to her disability. (Doc. 30 at 24). Defendants contend that Plaintiff's rotator surgery was a temporary condition that was not connected to her rheumatoid arthritis. (Doc. 25 at 7-9). Additionally, Defendants argue that Plaintiff could not perform the essential functions of her job because of her medical restrictions and argue that they made a "thorough effort to evaluate the situation before concluding that Plaintiff's restrictions could not be accommodated." (*Id.* at 11). Finally, Defendants argue that they did not terminate Plaintiff on the basis of her disability, but because she could not perform the essential elements of her job under her medical restrictions. (*Id.* at 17).

The ADA bars an employer from discriminating against an employee "on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112. To establish a *prima facie* case of disability discrimination under the ADA, a plaintiff must establish (1) that

she has a disability, (2) that she is otherwise qualified to perform the position with or without reasonable accommodation, (3) that the employer knew or had reason to know of her disability, (4) that she suffered an adverse employment action, and (5) she was replaced or the job remained open. *Rosebrough v. Buckeye Valley High Sch.,* 690 F.3d 427, 431 (6th Cir. 2012). If plaintiff is able to set forth a *prima facie* case, courts will apply the *McDonnell Douglass* burden-shifting analysis, wherein the burden then shifts to the employer to state a legitimate nondiscriminatory reason for the adverse employment action. *Nance v. Goodyear Tire & Rubber Co.,* 527 F.3d 539, 553 (6th Cir. 2008); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1972). If the employer can do so, plaintiff must identify evidence from which a reasonable jury could conclude that the reason the defendant offers is pretext for unlawful discrimination. *Nance,* 527 F.3d at 553. The TDA has similar requirements to those of the ADA, and the Court's analysis will thus be the same for both claims. *See* Tenn. Code Ann. § 8-50-103; *Nance* at 553 n. 5 ("Both federal and Tennessee disability discrimination actions require the same analysis.").

The crux of the parties' dispute lies in whether Plaintiff has a qualifying disability under the ADA and whether Plaintiff was qualified to perform her position with or without reasonable accommodation. If Plaintiff is able to establish that she has a qualifying disability, Defendants do not dispute their knowledge of this disability. The parties also do not dispute that Plaintiff suffered an adverse action by being terminated and that her job remained open after her termination. Accordingly, the Court will only address the disputed issues to determine if Plaintiff established a *prima facie* case of discrimination.

*1.    Plaintiff's Disability*

Defendants and Plaintiff disagree as to which condition constitutes a disability for Plaintiff's ADA claim.  Defendants assert that the rotator cuff surgery, which they describe as a "temporary condition," is a separate injury and is the disability at issue in this case.  (Doc. 25 at 9).  Plaintiff, on the other hand, claims that the underlying disability is Plaintiff's rheumatoid arthritis and argues that the rotator cuff injury is but a manifestation of the rheumatoid arthritis.  (Doc. 30 at 17).

The ADA was amended in 2008 by the ADA Amendments Act ("ADAAA").  The ADA Amendments Act, Pub. L. No. 110–325, 122 Stat. 3553 (effective September 25, 2008). The ADAAA expressly broadens the scope of the ADA, making the "primary object of attention in cases brought under the ADA . . . whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability."  29 C.F.R. § 1630.1(c)(4).  The ADAAA defines disability with respect to a person as "(a) a physical or mental impairment that substantially limits one or more major life activities of such individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment." 42 U.S.C. § 12102(1).  Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

Under the ADAAA, "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."  42 U.S.C. § 12102.  The ADAAA mandates a broad interpretation of the meaning of the word "disability," and imposes a "non-onerous" burden on a plaintiff at the *prima facie* stage.

*Haley v. Cmty. Mercy Health Partners*, 2013 WL 322493 (S.D. Ohio Jan. 28, 2013). Even if an impairment lasts less than six months, it can be considered substantially limiting under the ADAAA. 29 C.F.R. § 1630.2(j)(ix). If a plaintiff has a condition that is connected to an underlying disability, this is referred to as a "characteristic manifestation" of the qualifying impairment. *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 780 (6th Cir. 1998). The Sixth Circuit has held that a "characteristic manifestation of [the] physical impairment [is]. . . part of the underlying impairment." *Roush v. Weastec*, Inc., 96 F.3d 840, 844 (6th Cir. 1996) (holding that a plaintiff's bladder infections were connected with her disability of interstitial cystitis).

Thus, to determine if Plaintiff meets the first prong of her *prima facie* case, the Court must determine either that Plaintiff's rheumatoid arthritis is a qualifying disability that substantially limits one or more major life activities and her rotator cuff injury was a characteristic manifestation of her rheumatoid arthritis; or if Plaintiff's rotator cuff injury is a qualifying disability independent of her rheumatoid arthritis.

As discussed above, the ADAAA broadly interprets the term "disability," and does not impose a difficult burden on a plaintiff at the *prima facie* stage. Dr. Brackett testified that Plaintiff's rheumatoid arthritis substantially limits some of her major life activities. Specifically, he testified that Plaintiff had difficulty walking, lifting things, sleeping, and suffered from weakness due to pain in her joints. (Doc. 30-2 at 12). Plaintiff also articulates the way that her rheumatoid arthritis affects her ability to stand and how it causes pain in each of her joints. (Doc. 30-1 at 7-8). The ADAAA specifically states that walking, lifting objects, standing and sleeping are major life activities for the purposes of determining whether a condition is a disability under the ADAAA. 42 U.S.C.

§ 12102 (2)(A). Under the burden imposed by the ADAAA, it is clear that Plaintiff's rheumatoid arthritis would constitute a qualifying disability.

Next, the Court turns to the issue of whether Plaintiff's rotator cuff injury was connected to her underlying disability of rheumatoid arthritis. The parties vigorously dispute this issue, and there are genuine issues of material fact regarding whether there was a connection between the two conditions. While Dr. Brackett states that it is possible that Plaintiff's rheumatoid arthritis made her more vulnerable to a rotator cuff injury, his statements on their own do not establish a causal relationship between the two conditions. (Doc. 30-2 at 15-16). Similarly, by labeling the rotator cuff injury as a "discrete" injury without establishing sufficient factual support in the record for this conclusion, Defendants have failed to establish that there was not a causal relationship between Plaintiff's two conditions. (Doc. 25 at 9). Drawing all reasonable inferences in Plaintiff's favor, the Court concludes that she has established a causal relationship sufficient to meet the burden of proving her *prima facie* case. Because Plaintiff's rheumatoid arthritis is a qualifying disability and she has shown a causal relationship between her arthritis and her rotator cuff injury, Plaintiff has established the first prong of her *prima facie* case, and the Court will not discuss whether the rotator cuff injury was an independent qualifying disability.

2. *Defendants' Reasonable Accommodation*

The parties also dispute whether it was possible for Defendants to provide Plaintiff with a reasonable accommodation so that she could perform her job despite her medical restrictions. Defendants argue that Plaintiff was not qualified to perform her position because her medical restrictions required her to take a ten to fifteen minute break each hour of the work day. (Doc. 25 at 10). In response, Plaintiff argues that she

could have performed the job if Defendant had granted her a reasonable accommodation—that is, the ability to take breaks from typing. (Doc. 30 at 19).

Under the ADA, a qualified individual is one who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111. Reasonable accommodations include:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111. While a reasonable accommodation does not require the employer to eliminate essential functions of the job, it does require the employer to "to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3).

Drawing all reasonable inferences in her favor, Plaintiff has met her burden of showing that she was qualified to perform her job with a reasonable accommodation. In its brief, Defendants try to impose a burden on Plaintiff to create her own accommodations and come up with "suggestions of her own." (Doc. 25 at 12). Even though Plaintiff may be able to offer assistive input into creating a reasonable accommodation, the ADA is clear that this is not a burden that Plaintiff carries on her own. As Plaintiff's employer, Defendants had access to knowledge relating to resources

and personnel which placed them in a superior position to determine what reasonable accommodations could have been made for Plaintiff. Although Defendants state that they made a "thorough effort to evaluate the situation before concluding that Plaintiff's restrictions could not be accommodated," they do not list any of the potential possibilities that could accommodate Plaintiff's need to take a ten to fifteen minute break once an hour for a temporary period of time. (Doc. 25 at 11). Furthermore, Hurst's deposition illustrates that a reasonable accommodation could have been made for Plaintiff, as she discusses the possibility of part-time work and work that could be completed during Plaintiff's ten to fifteen minute breaks. (Doc. 30-3 at 70-72). Accordingly, Plaintiff has demonstrated the second prong of her *prima facie* case. Because Plaintiff has set forth a *prima facie* case for discrimination, the burden now shifts to Defendants to provide a legitimate, nondiscriminatory reason for Plaintiff's termination.

### 3. *Legitimate Nondiscriminatory Reason for Termination*

Defendants argue that Plaintiff was terminated because she could not perform the essential functions of her job since she used all of her FMLA leave. The Court finds this explanation too attenuated to establish a legitimate, nondiscriminatory reason for Plaintiff's termination. As discussed above, there are issues of fact as to whether Plaintiff needed to use more of her FMLA leave or if she could be reasonably accommodated in a way that did not require more FMLA leave. If Plaintiff could be reasonably accommodated, the explanation offered by Defendants cannot be rationally construed as legitimate and could reasonably be seen as discriminatory. Because of the numerous and genuine factual issues, the Court notes that Defendants failed to show that more FMLA leave would be required when Plaintiff returned to work. Defendants

are not entitled to summary judgment because they have failed to state a legitimate, nondiscriminatory reason for Plaintiff's termination. Accordingly, the Court will not address the issue of pretext, and summary judgment as to the Plaintiff's ADA and TDA claims will be **DENIED.**

### B.    FMLA Retaliation Claim

Under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.*, eligible employees are entitled to a total of 12 work weeks of leave during any 12-month period for certain events, including "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). In considering FMLA retaliation claims, the Sixth Circuit is clear that providing additional FMLA leave beyond this 12 week period within 12 months is not required or protected by the FMLA. *See Coker v. McFaul,* 247 F. App'x 609, 620 (6th Cir. 2007) ("There is no regulatory or statutory authority to impose upon an employer the obligation to provide FMLA in excess of the 12-week"). The FMLA also makes it unlawful for any employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the Act]." 29 U.S.C. § 2615(a)(1). Employers who violate the FMLA are liable to the employee for damages and such equitable relief as may be appropriate. 29 U.S.C. § 2617(a)(1).

In order to prove a claim of FMLA retaliation, a plaintiff must establish by a preponderance of the evidence that: "(1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action." *Killian v. Yorozu Auto.*

*Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006) (citing *Arban v. West Publ'g Co.*, 345 F.3d 390, 404 (6th Cir. 2003)). An FMLA retaliation claim accordingly centers around "whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason," and "[t]he employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically because those employees invoked their FMLA rights." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (citation and internal quotation marks omitted).

"The burden of proof at the *prima facie* stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Seeger*, 681 F.3d at 283 (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)); *see also EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (noting that plaintiff's burden of establishing a *prima facie* case is not an onerous one). The Sixth Circuit has held that "acutely" close temporal proximity between the protected activity and the adverse employment action "is deemed indirect evidence such as to permit an inference of retaliation[.]" *Id.* at 283-84 (quoting *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004)).

The *McDonnell Douglas* burden shifting framework apples to FMLA retaliation claims. *Romans*, 668 F.3d at 842; *McDonnell Douglas Corp*, 411 U.S. at 802-04. Thus, after the plaintiff establishes a *prima facie* case of FMLA retaliation, the burden shifts to the defendant to establish a legitimate, non-discriminatory reason for its action. *Id.* If the defendant sets forth a legitimate, non-discriminatory reason for the adverse employment action, the burden then shifts back to the plaintiff to establish pretext by showing that the employer's proffered reasons (1) have no basis in fact, (2) did not

actually motivate the action, or (3) were insufficient to warrant the action. *Seeger*, 681 F.3d at 285 (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

In this case, there is no dispute as to the first three prongs of the *prima facie* case; Defendants concede that Plaintiff's leave during 2010 qualified as FMLA leave and acknowledge that she was terminated directly after taking FMLA leave. Defendants dispute only the fourth prong, that is, that there was a causal connection between Plaintiff's FMLA leave and her termination. Specifically, Defendants argue that "[n]o evidence exists to support this speculative claim" that there was a causal connection between Plaintiff's FMLA leave and her termination. (Doc. 25 at 20).

The Court disagrees and finds that Plaintiff has met her minimal burden of proof to establish a *prima facie* case of FMLA retaliation. The evidence demonstrates that Defendants negatively addressed Plaintiff's sick leave several times, including informing her that taking leave could result in termination. At Plaintiff's unemployment hearing, Hurst clearly stated that "if someone had to go because the real estate market is down, it would be the person that had the least amount of leave and was the least productive person on the staff." (Doc. 30-19 at 3). In Plaintiff's 2009 Evaluation, Hurst specifically noted that Plaintiff's sick leave was considered a part of her "unsatisfactory job performance." (*Id.*). Moreover, Plaintiff's termination occurred the day after Plaintiff was released to return to work with certain medical restrictions after her FMLA leave. (Doc. 30-18 at 2). Based on the temporal proximity and Defendants' negative treatment of Plaintiff's leave, the Court finds that Plaintiff has shown a causal connection between her FMLA leave and her termination, and has thus met her burden of proof to establish a *prima facie* case of FMLA retaliation.

The burden accordingly shifts to Defendants to show a legitimate, nondiscriminatory reason for Plaintiff's termination. As previously noted, Defendants argue that Plaintiff's termination was based on the depletion of her FMLA leave and her inability to return to work. (Doc. 25. at 22). In response, Plaintiff asserts that she was capable of performing the essential elements of the job, as long as she had a reasonable accommodation for a limited period of time. (Doc. 30 at 10). From the evidentiary record, it appears that Defendants made a very limited inquiry into what accommodations could be made for Plaintiff. When asked whether Hurst considered permitting Plaintiff to perform part-time work for a limited period of time, Hurst replied that she did not consider this. (Doc. 30-3 at 72). Although Defendants did not consider this option or other options in offering Plaintiff an accommodation, they previously stated that she could be reduced to part-time work when she was working on the back-scanning project. (Doc. 30-4 at 2). Accordingly, it follows that part-time work is just one of several possibly available accommodations that Defendants could have offered Plaintiff.[5] The Court concludes that Defendants have failed to prove that additional leave was needed when Plaintiff was cleared to return to work with certain medical restrictions. These arguments concerning whether a reasonable accommodation could have been made speak to the ultimate issue of whether Defendants' proffered reason of FMLA depletion was legitimate in these circumstances. Because the Defendants have been unable to uphold their burden of showing a legitimate, nondiscriminatory reason for Plaintiff's termination, the Court cannot conclude as a matter of law that Plaintiff's termination was not motivated by retaliation for her exercise of her FMLA rights.

---

[5] Hurst also states in her deposition that she did not consider the possibility that Plaintiff could have performed other tasks during the ten to fifteen minute breaks. (Doc. 30-4 at 2).

Defendants' Motion for Summary Judgment will be **DENIED** as to Plaintiff's FMLA Retaliation claim.

### C.    FMLA Interference Claim

In addition to her retaliation claim, Plaintiff's First Amended Complaint also includes a claim that she was subject to FMLA interference "in violation of 29 U.S.C. § 2615(a)(2)." (Doc. 15 at 6). In its Motion for Summary Judgment, Defendants argue that Plaintiff's FMLA interference claim should be dismissed, as Plaintiff was granted 12 weeks of FMLA leave. (Doc. 25 at 18-20). In her Response, Plaintiff does not address this claim. The Court agrees with other courts that have held that a party may abandon claims by failing to address or support them in a response to a motion for summary judgment. *See, e.g.*, *Clark v. City of Dublin, Oh.*, 178 F. App'x 522, 524-25 (6th Cir. 2006) (finding that, when a plaintiff did not properly respond to arguments asserted by a defendant's motion for summary judgment as to two claims, "the District Court did not err when it found that the Appellant abandoned [those] claims"); *Conner v. Hardee's Food Sys., Inc.*, 65 F. App'x 19 (6th Cir. 2003) (finding that the plaintiffs had abandoned their claim "[b]ecause [they] failed to brief the issue before the district court"); *see also Parker v. Zale Corp.*, 864 F. Supp. 2d 670,684-85 (E.D. Tenn. 2012) (finding that defendants are entitled to summary judgment as to claims that plaintiff abandons at the summary judgment stage); *Anglers of the Au Sable v. United States Forest Svc.*, 565 F. Supp. 2d. 812, 839 (E.D. Mich. 2008) ("It is well settled that abandonment may occur where a party asserts a claim in its complaint, but then fails to address the issue in response to an omnibus motion for summary judgment."); *Morris v. City of Memphis*, 2012 WL 3727149, at *2 (W.D. Tenn. Aug. 27, 2012) (collecting cases). The Court will thus deem Plaintiff's FMLA interference claim abandoned, and

Defendants' Motion for Summary Judgment will be **GRANTED** with respect to that claim.

### D.    42 U.S.C. § 1983 Claim

Finally, Plaintiff's First Amended Complaint also includes a claim for discrimination under 42 U.S.C. § 1983.  To state a viable claim under 42 U.S.C. § 1983, a plaintiff must allege he was deprived of a right, privilege, or immunity secured by the Constitution or laws of the United States by a person acting under color of law, without due process of law.  *Flagg Brothers Inc. v. Brooks*, 436 U.S. 149, 155 (1978); *Brock v. McWherter*, 94 F.3d 242, 244 (6th Cir. 1996).

Plaintiff and Defendants agree that the Court must determine whether Plaintiff's § 1983 claim can be brought concurrently with Plaintiff's ADA claim.[6]  *See* Doc. 25 at 23 (stating that the §1983 claim is preempted because it "mirrors" the ADA claim); Doc. 30 at 26-27 (arguing that the § 1983 claim should not be dismissed because it "goes above and beyond just the requirements of the ADA.").  The Sixth Circuit has not explicitly addressed the issue of concurrent ADA and § 1983 claims.   In Title VII cases, however, the Sixth Circuit has held that "[w]here an employee establishes employer conduct which violates both Title VII and rights derived from another source—the Constitution or a federal statute—which existed at the time of the enactment of Title VII, [if] the claim based on the other source is independent of the Title VII claim, [] the plaintiff may

---

[6] Other circuits that have dealt with this issue have determined that permitting a plaintiff to sue a defendant under both the ADA and § 1983 would be "duplicative" and would effectively give a plaintiff "two bites at precisely the same apple." *Holbrook v. City of Alpharetta, Ga.*, 112 F.3d 1522, 1531 (11th Cir. 1997); *see also M.M.R.-Z. ex rel. Ramirez-Senda v. Puerto Rico*, 528 F.3d 9, 13 n.3 (1st Cir. 2008) ("Section 1983 cannot be used as a vehicle for ADA or other statutory claims that provide their own frameworks for damage"); *Pona v. Cecil Whittaker's, Inc.*, 155 F.3d 1034, 1038 (8th Cir.1998), *cert. denied,* 526 U.S. 1131 (1999) (" [We] think that Congress has, under the applicable legal principles, rather clearly indicated an intention to make the remedies that Title II [of the ADA] gives the exclusive ones for the enforcement of that subchapter").  Accordingly, even under this standard, Plaintiff would not be permitted to bring both claims as they both wholly depend on Plaintiff's disability.

seek the remedies provided by § 1983 in addition to those created by Title VII." *Day v. Wayne Cnty. Bd. of Auditors*, 749 F.2d 1199, 1205 (6th Cir. 1984); s*ee also Russell v. Ohio, Dep't of Admin. Servs.,* 302 F. App'x 386, 390 (6th Cir. 2008); *Woodruff v. Ohman*, 29 F. App'x 337, 343 (6th Cir. 2002).

Applying this reasoning to the ADA, and ultimately to this case, Plaintiff's claim fails. In her brief, Plaintiff explains that the constitutional violations she alleges are brought because the Defendants discriminated against her "on the basis of a disability." (D0c. 30 at 27). Rather than stemming from rights "derived from another source," Plaintiff's § 1983 claim completely depends on her ADA claim. [7]  *See Day*, 749 F.2d at 1205. Because Plaintiff's § 1983 claim is wholly dependent on the rights derived from her ADA claim, the Court will **GRANT** Defendant's motion as to this claim.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motions for Summary Judgment will be **GRANTED** as to Plaintiff's claims of FMLA interference and § 1983 discrimination. However, Defendants' Motions for Summary Judgment will be **DENIED** as to Plaintiff's FMLA retaliation and ADA and TDA discrimination claims. The Court hereby **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment (Doc. 24).

A separate order will be entered setting forth dates for the remainder of the litigation.

---

[7] Even if Plaintiff's § 1983 claim was considered independent from her ADA claim, she has not met the burden set forth in the statute, and Defendants are entitled to summary judgment. *See McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 463 (6th Cir. 2006); *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009).

**SO ORDERED** this 4th day of September, 2013.

_/s/ Harry S. Mattice, Jr._
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE
